## A94A1040. JAMES v. HARPER.
(444 SE2d 587)

BIRDSONG, Presiding Judge.

Bobby Lee James appeals from the order of the state court granting judgment n.o.v. to appellee/defendant James E. Harper. Appellant was shot by appellee and brought suit for damages; appellee defended, inter alia, on a self-defense claim.

In the July term of state court, the jury awarded a $9,000 verdict to appellant and appellee filed a motion for judgment n.o.v.; the order granting judgment n.o.v. was entered during the December term. The order pertinently states: "The hearing on [appellee's] motion having been regularly scheduled . . . and with counsel for [appellant] having failed to appear at the appointed time of the hearing and within a reasonable period thereafter; and the court having reviewed the [appellee's] motion and the evidence upon which the motion was based; and it appearing . . . that there is no conflict in the evidence and that the [appellee] is entitled to judgment as a matter of law, it is ordered . . . that judgment be entered for the [appellee]." *Held*:

Judgment n.o.v. may not be granted unless there is no conflict in the evidence as to any material issue and the evidence introduced with all reasonable deductions therefrom demands a certain verdict. *Three Notch EMC v. Simpson*, 208 Ga. App. 227, 228 (1) (430 SE2d 52). "[J]udgment n.o.v. is not authorized when the evidence merely preponderates toward a certain verdict." Id. at 230. In determining whether to grant judgment n.o.v. the trial court *cannot* weigh the credibility of the evidence. *Austin v. Kaufman*, 203 Ga. App. 704, 707 (1) (417 SE2d 660). Where there is conflicting evidence as to a material issue, or insufficient evidence to render a "one-way" verdict proper, judgment n.o.v. should not be awarded. Id. " 'In considering the motion, the court must view the evidence in the light most favorable to the party who secured the jury verdict' "; this procedure has equal application to appellate courts. Id.

The conflicting evidence when viewed in favor of supporting the

jury verdict, under the above legal guidelines, reveals the following: Appellant testified he had been dating Karen for approximately four years. Subsequently, appellant became suspicious that Karen was at appellee's trailer home because he saw her car and appellee's truck parked outside the premises. He knocked on the door but no one would answer; appellant hit the door real hard with his fist and it flew open. Appellant walked to the back of the trailer, saw appellee's handgun lying on the bar, and then observed appellee jump out of bed "buck naked" and Karen standing in the corner of the bedroom area. Appellee came toward him and appellant slammed him against the wall because he thought appellee was going toward his gun. Appellant told appellee to leave Karen alone and he and Karen started to leave. When appellee followed them out, appellant grabbed the gun and put it behind the couch because he was scared. Appellant and Karen continued their relationship and went together on a week-long vacation in Florida; appellant, however, was suspicious that Karen was still seeing appellee. A month or more later, appellant learned Karen was not at work and, accompanied by a friend, he went looking for her. He found her car parked inside appellee's closed garage doors. Appellant went to appellee's trailer home; the screen door was closed but the door was open. Appellant "just opened the door and went in," hollering Karen's name. Appellant saw appellee at the end of the trailer with a gun in his hand; appellee's roommate was sitting on the couch. Karen then exited the bathroom and appellant told her to leave; Karen went out the back door. At this point the appellee had the gun drawn and was advancing toward appellant. Appellant grabbed the roommate and told appellee that " 'if you shoot me, you're going to have to shoot your roommate.' " Appellant began to creep out the door; walking backward holding the roommate. Several times, during the entire episode, appellee told appellant, "get out of my house, I'm going to blow your . . . head off." The roommate told appellee to shoot appellant, struggled free, and ran out the back door; at the same time, appellant ran out the door he had entered. Appellant was in the house for about 45 seconds; he did not throw a hammer at appellee inside the house. As appellant fled the house, appellee followed and shot three times toward appellant. Appellee shot once from the deck of his home, firing down at appellant who had stopped to get Karen to her car after she fell on the ground. Appellee was 21 feet away from appellant at the time of the shot. Appellant walked with Karen toward her car and appellee fired a second shot from the top of his steps about 45 feet away. Appellant turned and told appellee "to just put the gun down, because I was leaving." Appellant was going toward his car when appellee fired a third shot. (There also is evidence that these three shots were fired as warning shots at appellant's feet.) Appellee again threatened to shoot appellant. Believing

that appellee would shoot him in the back, appellant then got behind appellee's truck for cover. Appellee was in the front of the truck and appellant was behind it. When he went around the truck, appellant was seeking cover; his mind "was going so fast, [he] really didn't know," but the truck was filled with trash and appellant, believing appellee had fired five shots at him, grabbed a bottle from the truck and threw it at appellee. Appellant was thinking "if [he] threw the bottle, [he could] get [appellee] to get that last shot off, [appellant] could take the gun away from [appellee]." As appellant threw the bottle, appellee pulled up the gun, pointed it at appellant's head, and shot appellant in the chest from a distance of about 39 feet. At the time he was shot, appellant was not rushing or moving toward appellee; as appellant released the bottle, appellee "pulled the gun up and fired it." Appellant did lunge forward simply because he was throwing the bottle, "but it was 35 [feet] away from [appellee]." Appellant denied walking toward appellee; he was going to go toward appellee to try to disarm him, but when appellant released the bottle he was shot and fell to the ground. Appellee then approached, cocked the gun again, and said to appellant who lay wounded on the ground, "get out of my yard. I'm going to blow your . . . head." This remark was also directed toward a friend of appellant who had run over to help him. Appellee offered the wounded appellant no assistance. Appellant later told his friend that he did not believe the appellee would actually shoot him in the chest; he thought this because appellee had not shot him inside the trailer.

Appellant also introduced in evidence a series of photographs. Plaintiff's Exhibit 10 was admitted without objection as a picture depicting the relative position in which appellant was standing when he was shot by appellee; the photograph was identified as being taken from the point where appellee was standing when he shot appellant. (This photograph being duly admitted in evidence was available to the jury for whatever weight they wished to give it in determining how far appellant was from appellee when he was shot.) Another photograph, Plaintiff's Exhibit 11, also admitted without objection, was identified as depicting the shooting distance from the opposite direction.

The jury could judge witness credibility and elect to believe appellant's testimony as follows: appellant was attempting to flee the premises when he was pursued by appellee who shot at appellant or his feet as he fled, appellant sought cover behind the truck, and threw a bottle at appellee for the purpose of getting appellee to fire his last shot so he could be disarmed before he could shoot appellant. The jury further could conclude that appellee was standing on the ground a substantial distance from appellant when he shot him. Appellee further threatened to shoot appellant with the cocked pistol after having

wounded him, unless appellant immediately left his yard. Whether, under these circumstances, appellee used excessive force in self-defense and thereby became the aggressor was a question of fact for jury resolution. Compare *McNatt v. McRae*, 117 Ga. 898, hns. 2, 3 (45 SE 248).

We decline to address appellee's contentions as to the credibility of appellant's testimony; it is not the function of this court to judge witness credibility or weigh the evidence. The conflicting testimony in this case warranted jury resolution, and the trial court erred in granting judgment n.o.v. in behalf of appellee.

*Judgment reversed. Cooper and Blackburn, JJ., concur.*

DECIDED MAY 9, 1994.

*Sorenson & Haskell, George O. Haskell III*, for appellant.
*Lane & Jarriel, Thomas F. Jarriel*, for appellee.